ANCHOR WALL SYSTEMS, INC.,
Plaintiff–Appellant,

v.

ROCKWOOD RETAINING WALLS, INC., GLS Industries, Inc., Equipment, Inc., Raymond R. Price, and Gerald P. Price, Defendants–Appellees.

No. 02–1592.

United States Court of Appeals, Federal Circuit.

DECIDED: Aug. 13, 2003.

Rehearing and Rehearing En Banc Denied: Oct. 7, 2003.

J. Derek Vandenburgh, Carlson, Caspers, Vandenburgh & Lindquist, P.C., of Minneapolis, MN, argued for plaintiff-appellant. With him on the brief was Alan G. Carlson.

Randall T. Skaar, Patterson, Thuente, Skaar & Christensen, P.A., of Minneapolis, MN, argued for defendants-appellees. With him on the brief were Eric H. Chadwick and Scott G. Ulbrich. Of counsel on the brief was Malcolm L. Moore, Moore & Hansen, of Minneapolis, MN.

Before NEWMAN, BRYSON, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

Anchor Wall Systems, Inc. ("Anchor") appeals from the final judgment of the United States District Court for the District of Minnesota granting Rockwood Retaining Walls, Inc., GLS Industries, Inc., Equipment, Inc., Raymond R. Price, and Gerald P. Price's (collectively, "Rockwood's") motion for partial summary judgment of noninfringement of six of Anchor's patents: U.S. Patent Nos. 5,490,363 ("the '363 patent"), 5,704,183 ("the '183 patent"), 5,711,129 ("the '129 patent"), 5,827,015 ("the '015 patent"), 6,142,713 ("the '713 patent"), and 6,183,168 B1 ("the '168 patent"). *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 252 F.Supp.2d 838 (D.Minn.2002). Because the district court did not err in granting the motions to strike the declarations of Peter Janopaul, we affirm that portion of the judgment. Because, however, the district court erred in its claim construction, we reverse that portion of the district court's judgment and remand for further proceedings consistent with this opinion. Finally, because the district court concluded that there was a complete bar to application of the doctrine of equivalents pursuant to this court's ruling in *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 234 F.3d 558 (Fed.Cir.2000) (*en banc*), *vacated and remanded*, 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944 (2002), we vacate that

portion of the district court's judgment and remand for further proceedings consistent with this opinion.

# I. BACKGROUND

## A. The Patented Claims

Anchor is the assignee of the six patents at issue, which disclose and claim, *inter alia,* the interlocking features of masonry blocks that can be stacked to form retaining walls that resist ground pressure without requiring any additional support structure.

### 1. The '363 Patent Family

The '363, '183, and '129 patents (collectively, "the '363 patent family"), which are related to one another as continuations-in-part, disclose and claim blocks with integral concrete features that interact to locate the blocks relative to each other in a wall and lock the blocks together sufficiently to resist earth pressure from behind the wall. Figure 4 of the '363 patent shows one preferred embodiment:

U.S. Patent Feb. 13, 1996 Sheet 3 of 7 5,490,363

FIG. 4

'363 patent, fig. 4; *see also* '183 patent, fig. 4; '129 patent, fig. 4. The block has a front surface 12, side surfaces 14 and 16, and a back surface 18. '363 patent, col. 3, ll. 28–33; '183 patent, col. 3, ll. 32–37; '129 patent, col. 3, ll. 55–60. The block has an integral concrete protrusion 26 formed on the top surface of the block, and insets 22A and 22B formed in the side surfaces 14 and 16 of the block. '363 patent, col. 3, ll. 36–38; '183 patent, col. 3, ll. 40–42; '129 patent, col. 3, ll. 63–65. A course of these blocks is laid, with the protrusions 26 pointing up, as shown in Figure 7 of the '363 patent:

**FIG. 7**

'363 patent, fig. 7; *see also* '183 patent, fig. 7; '129 patent, fig. 7. A block in the next ascending course is placed on top of the course below so that a protrusion 26 from the lower course fits into one of the side insets 22A or 22B of two adjacent blocks in the upper course. '363 patent, col. 5, ll. 46–51; '183 patent, col. 7, ll. 62–65; '129 patent, col. 10, ll. 38–41. The upper course block is pushed forward so that the back wall of the inset abuts the back of the protrusion 26. The abutment of protrusion 26 against one of the insets 22A or 22B resists the forward pressure of the earth.

Claim 14 of the '183 patent, which is representative of the claim terms at issue in the '363 patent family, reads:

14. A masonry block comprising a front surface, *a back surface,* a top surface and bottom surface, and first and second sides, said first side having a first inset wherein said first inset extends from said block top surface to said block bottom surface, said second side having a second inset wherein said second inset extends from said block top surface to said block bottom surface, said block comprising *a protrusion* on one of said top or bottom surfaces, said protrusion being configured to *mate* with an inset of one or more adjacently positioned blocks, said protrusion and insets having relative sizes and shapes adapted to permit relative rotation of the protrusion and the inset with which it is mated, whereby serpentine walls may be constructed from a plurality of such blocks.

'183 patent, col. 16, ll. 20–33 (emphases added).

#### 2. The '015 Patent Family

The '015, '713, and '168 patents (collectively, "the '015 patent family"), which are related to one another as continuations-in-part, disclose blocks designed to build an entire mortarless retaining wall using one type of block. Figures 4, 5, and 6 of the '015 patent show one preferred embodiment:

FIG.4

FIG.5

FIG.6

'015 patent, figs. 4, 5, and 6; *see also* '713 patent, figs. 4, 5, and 6; '168 patent, figs. 4, 5, and 6. The written description describes this preferred embodiment as having a top surface 26 and bottom surface 28 that are generally planar and parallel to one another. '015 patent, col. 5, ll. 4–6; '713 patent, col. 5, ll. 9–11; '168 patent, col. 5, ll. 7–9. A front surface 22 and a back surface 24 are also generally planar and parallel to one another, and are perpendicular to the top and bottom surfaces. *Id.* The blocks of the preferred embodiments have "two part" sidewall surfaces. '015 patent, col. 4, ll. 20–28; '713 patent, col. 4, ll. 25–34; '168 patent, col. 4, ll. 24–32. The first part 34, 38 tapers back at an angle á of less than 90 degrees with respect to the front surface, while the second part 32, 36 tapers inwardly toward the rear surface at an angle â of less than 90 degrees with respect to the back surface. *Id.* A flange 40 extends downwardly from the lower back of the block. '015 patent, col. 4, ll. 29–38; '713 patent, col. 4, ll. 35–

44; '168 patent, col. 4, ll. 33–42. The flange contains a locking surface 44 that interacts with the back surface of the block immediately below to automatically locate and restrict movement of the upper block relative to the lower blocks. *Id.*

Claims 38 and 50 of the '015 patent, as well as claims 30, 43, 61, and 70 of the '713 patent, are at issue in this appeal. Claim 38 of the '015 patent, which is representative of the claim terms at issue in claim 50 of the '015 patent as well as claims 30 and 43 of the '713 patent, reads:

> 38. A composite masonry block suitable for landscape applications, comprising:
>
> a) a solid and generally planar top face;
>
> b) a bottom face which is *generally parallel* to the top face;
>
> c) a rear face which is generally perpendicular to the top and bottom faces;
>
> d) a front face which is generally perpendicular to the top and bottom faces,

and which includes opposed portions which diverge as they extend towards the rear face of the block;

e) opposed solid side faces which are generally perpendicular to the top and bottom faces, each of said solid side faces extending from an opposed diverging portion of the front face to the rear face, said side faces converging as they extend towards the rear face; [sic, and]

f) a lower rear locator lip formed integrally with the bottom face of the block, and located adjacent to the rear face of the block, so that the lip is adapted to establish a uniform setback from course to course when a plurality of like blocks are laid in courses, and comprises a rear face which is *an extension of the block rear face* below the bottom face of the block.

'015 patent, col. 16, ll. 38–61 (emphases added).

Claim 61 of the '713 patent reads:

61. [sic, A] retaining wall block comprising a front face, a rear face, upper and lower surfaces, opposed side faces and a locator flange, and wherein:

a) the front, rear, and side faces are substantially vertical;

b) the upper and lower surfaces are *substantially horizontal* and both surfaces are uninterrupted with holes for receiving and supporting pins used to position blocks;

c) the side walls converge towards each other from front to back, so that the front face of the block is wider than the rear face;

d) the flange extends below the lower surface at the rear of the block; and

e) the block is free from cores extending through the block, either from the upper to the lower surface, or from one side to the other.

'713 patent, col. 17, ll. 26–42 (emphasis added).

Claim 70 of the '713 patent reads:

70. A masonry block suitable for forming a serpentine retaining wall by dry stacking multiple blocks into successive overlying courses of blocks wherein the sidewalls of adjacent blocks are in contact to avoid gaps between adjacent blocks, said block comprising:

a) a block body, said block body comprising a generally vertical front surface and a back surface, said front and back surfaces being separated by a distance comprising the depth of the block; a generally planar upper surface and a lower surface, said upper and lower surfaces intersecting said generally vertical front surface and permitting generally parallel alignment between the upper surface of a block and the upper surface of the adjacent blocks in the next adjacent course of blocks, and first and second sidewall surfaces, each of said sidewall surfaces comprising a first part and a second part, said sidewall surface first parts extending rearwardly from the block front surface at an angle of ninety degrees or less, and sidewall surface second parts joining their respective *sidewall surface first parts to the back surface, said second parts converging toward each other and intersecting the back surface at an angle of less than ninety degrees;* and

b) a flange extending downwardly from the lower surface of the block body, said flange comprising a setback surface and a locking surface, said flange permitting the masonry block to be positioned over and in engagement

with other masonry blocks as courses of blocks are laid one on another, thereby producing the desired setback.

'713 patent, col. 18, ll. 13–43 (emphasis added).

## B. The District Court's Determination

Anchor brought an action against Rockwood, who markets and manufactures a competing line of concrete blocks for use in the construction of retaining walls, alleging that Rockwood Wall, Inc.'s Classic block infringed certain claims of the '363 patent family and that Rockwood Wall, Inc.'s Cottage Stones II, III, and IV infringed certain claims of the '015 patent family. With respect to the '363 patent family, the district court first construed the claim terms "back surface," "protrusion," and "mate." The district court construed "back surface" to include the special characteristic of "spanning the full width of the block." *Anchor*, 252 F.Supp.2d at 848. The district court construed "protrusion" to include the limitation of having "a central narrow portion." *Id.* The district court construed "mate" to require three limitations: (1) a close confinement of the protrusion within the inset(s) of one or more blocks; (2) an ability to secure the blocks in place in a forwards and backwards direction; and (3) an interlocking of the protrusion with the insets. *Id.* at 844–45.

The district court determined that the Classic block did not literally infringe the '363 patent family. Specifically, the district court determined that the Classic block does not have a "back surface" spanning the full width of the block, but rather "a partial back side portion with pointed side extensions that do not abut each other when placed adjacently in a course of blocks." *Id.* at 849 n. 13. The district

court also determined that the " 'protrusion' on the Classic block is not a protrusion [having a central narrow portion] as claimed by Anchor, but rather a square extension extending from the bottom surface of the block." *Id.* at 849 n. 14. Finally, the district court determined that the square extension and inset of the Classic block do not "mate" because they "do not cooperate to restrain the block's setback in both a forward and backward direction." *Id.* at 849 n. 12.

Additionally, with respect to the '015 patent family, the district court construed "generally parallel" as parallel *per se*, that is, "everywhere equally distant." *Id.* at 853 (citing *Merriam–Webster Collegiate Dictionary* 842 (10th ed.1998)). The district court declined to construe the disputed claim term "substantially horizontal." The district court determined that Cottage Stones II, III, and IV did not literally infringe the '015 patent family, because the district court found the Cottage Stones to have a concave bottom surface. Furthermore, with respect to infringement of the '015 patent under the doctrine of equivalents, the district court concluded that, because Anchor had amended the asserted claims of the '015 patent during prosecution, there was a complete bar to application of the doctrine of equivalents pursuant to this court's ruling in *Festo*, 234 F.3d at 574.

The district court proceeded to grant Rockwood's motion for partial summary judgment of noninfringement of the '363 and '015 patent families. The district found that there was no genuine issue of material fact, in part, because it granted defendants-appellees' motions to strike the expert testimony of Peter Janopaul for being untimely, and alternatively, for being contradictory to previous sworn testimony.

Anchor timely appealed, and we have jurisdiction pursuant to . 28 U.S.C. § 1295(a)(1).

## II. STANDARD OF REVIEW

 Our review of a district court's grant of a motion for summary judgment of patent infringement or noninfringement is without deference. *Prima Tek II, L.L.C. v. Polypap, S.A.R.L.,* 318 F.3d 1143, 1147 (Fed.Cir.2003). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

 A patent infringement analysis entails two steps. First, determining the meaning and scope of the patent claims asserted to be infringed is a question of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970–71 (Fed.Cir.1995) (*en banc*), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review *de novo, Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (*en banc*). Second, comparing the properly construed claims to the device accused of infringing is a question of fact, *Bai v. L & L Wings, Inc.,* 160 F.3d 1350, 1353 (Fed.Cir.1998).

 We generally apply the law of the pertinent regional circuit when the precise issue to be addressed involves an interpretation of the Federal Rules of Civil Proce-dure. *See Bose Corp. v. JBL, Inc.,* 274 F.3d 1354, 1360 (Fed.Cir.2001). The Eighth Circuit reviews the district court's imposition of discovery sanctions under Fed.R.Civ.P. 37 for an abuse of discretion. *Savola v. Webster,* 644 F.2d 743, 745–47 (8th Cir.1981).

## III. DISCUSSION

### A. *Interpretation of the Claims*

 Generally, the words used in a claim are deemed to have their ordinary and customary meaning in their normal usage in the field of the invention. *Toro Co. v. White Consol. Indus.,* 199 F.3d 1295, 1299 (Fed.Cir.1999). To help inform the court of the ordinary meaning of the words, a court may consult a dictionary, encyclopedia, or treatise. *Tex. Digital Sys., Inc. v. Telegenix Inc.,* 308 F.3d 1193, 1202 (Fed.Cir.2002). Nevertheless, the presumption in favor of the ordinary meaning of claim language as understood by one of ordinary skill in the art may be overcome where the patentee chooses to be his or her own lexicographer by clearly setting forth a definition for a claim term in the specification. *Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 990 (Fed.Cir.1999).

 Similarly, the examination of the written description and drawings is necessary to determine whether the patentee has disclaimed subject matter or has otherwise limited the scope of the claims. *Apex Inc. v. Raritan Computer, Inc.,* 325 F.3d 1364, 1374 (Fed.Cir.2003). Notwithstanding the fact that the claim language must be examined in light of the written description, limitations may not be read into the claims from the written description. *Prima Tek,* 318 F.3d at 1148. Similarly, the mere fact that the patent draw-

ings depict a particular embodiment of the patent does not operate to limit the claims to that specific configuration. *Hockerson–Halberstadt, Inc. v. Avia Group Int'l, Inc.,* 222 F.3d 951, 956 (Fed.Cir.2000). We have recognized that there is sometimes "a fine line between reading a claim in light of the specification, and reading a limitation into the claim from the specification." *Comark Communications, Inc. v. Harris Corp.,* 156 F.3d 1182, 1186 (Fed.Cir.1998).

■ We have also noted that "[a]fter examining the written description and the drawings, the same confirmatory measure must be taken with the prosecution history, since statements made during the prosecution of a patent may affect the scope of the invention." *Rexnord Corp. v. Laitram Corp.,* 274 F.3d 1336, 1343 (Fed.Cir.2001). During prosecution, an inventor may surrender coverage of material that would otherwise be covered by a claim; however, the surrender must be clear and unmistakable. *Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1325–26 (Fed.Cir.2003).

■ In short, to determine the proper scope and meaning of the patent claims asserted, this court primarily consults the intrinsic evidence, that is, (1) the claims, (2) the written description, and, if in evidence, (3) the prosecution history. *Vitronics Corp. v. Conceptronic, Inc.,* 90 F.3d 1576, 1582 (Fed.Cir.1996).

### 1. The "back surface," "protrusion," and "mate" limitations in the '363 patent family

With respect to the '363 patent family, Anchor argues that the district court erred in its construction of the terms "back surface," "protrusion," and "mate," and that under the correct claim construction there is a genuine issue of material fact as to

literal infringement by the Classic block so as to preclude the entry of summary judgment on that issue. Rockwood responds that the district court, relying on the claim language and the written description in conjunction with the drawings, properly attributed "special limited meanings," *Anchor,* 252 F.Supp.2d. at 845, to the disputed claim terms.

### a. "Back Surface"

■ The independent claims of the '363 patent family require a masonry block comprising "a front surface, *a back surface,* a top surface, and bottom surface, and first and second sides." *See, e.g.,* '183 patent, col. 16, ll. 20–23 (emphasis added). The district court construed the "back surface" limitation to require a back surface "spanning the full width of the block." *Anchor,* 252 F.Supp.2d at 847. This was error.

The ordinary meaning of the claim term "back surface" is a surface at the back of the block. *See Webster's Third New International Dictionary* 157 (1993) (defining "back" as "the side or surface of something that is opposite to the side that is regarded as its front or face"); *id.* at 2300 (defining "surface" as "the exterior or outside of an object or body"). The written description does not compel a construction different from the plain meaning of "back surface." In departing from the ordinary meaning of "back surface," the district court relied on the written description, which stated "if the desired structure is to be inwardly curving, blocks of the invention ... may be completed by striking leg 24A or 24B with a chisel adjacent deflection 19, see FIGS. 1 and 4." *Anchor,* 252 F.Supp.2d at 847 (citing '183 patent, col. 8, ll. 10–15). The district court concluded that "[t]he specification would not address the necessity of

chiseling off a portion of that 'back surface' if it did not inhere in the meaning of the term that the 'back surface' spanned the full width." *Id.* Contrary to the district court's analysis, we do not read this excerpt to conclude that "back surface" is necessarily limited to a back surface "spanning the full width of the block." *Id.* For us to do so here would be to impermissibly read a limitation into the claims from the written description. *Comark,* 156 F.3d at 1186 ("[W]hile . . . claims are to be interpreted in light of the specification and with a view to ascertaining the invention, it does not follow that limitations from the specification may be read into the claims." (internal quotation marks and citation omitted)). Furthermore, the parties point to nothing in the prosecution history that clearly and unmistakably disclaims a back surface that does not extend the full width of the block. Accordingly, we hold that the proper construction of "back surface" is a surface at the back of the block.

### b. "Protrusion"

■ The claims of the '363 patent family require "a *protrusion* on one of said top or bottom surfaces" of the claimed block. *See, e.g.,* '183 patent, col. 16, ll. 20–33 (emphasis added). The district court construed "protrusion" to include the limitation of having a "central narrow portion." This was error.

The ordinary meaning of the claim term "protrusion" is something that protrudes. *See Webster's Third New International Dictionary* 1826. The district court relied on the written description, which states that, "[t]he central narrow portion in protrusion 26 (FIGS 1–6) allows for orientation of the blocks to provide inner curving and outer curving walls by the aligned seating and the relative rotation of the protrusion 26 within, and in relationship to, any block inset 22A or 22B," '183 patent, col. 5, ll. 9–13, to conclude that this statement attaches the characteristic of having a central narrow portion to the term "protrusion." *Anchor,* 252 F.Supp.2d at 848. Contrary to the district court's claim construction, the written description does not describe "with reasonable clarity, deliberateness, and precision," *In re Paulsen,* 30 F.3d 1475, 1480 (Fed.Cir.1994), that "protrusion" requires a "central narrow portion." Indeed, the many uses of the term in the written description are consistent with the ordinary meaning of "protrusion," one encompassing protrusions of any number of shapes. *See, e.g.,* '363 patent, col. 4, ll. 55–56 ("While the *protrusions may take any number of shapes,* they *preferably* have a kidney or dogbone shape." (emphases added)). The general rule, of course, is that claims of a patent are not limited to a preferred embodiment, unless by their own language. *See, e.g., Va. Panel Corp. v. MAC Panel Co.,* 133 F.3d 860, 866 (Fed.Cir.1997) ("[I]t is well settled that device claims are not limited to devices which operate precisely as the embodiments described in detail in the patent."). There is nothing in this case that warrants departing from the general rule.

■ Moreover, it is axiomatic that a claim construction that excludes a preferred embodiment such as the circular protrusions disclosed in Figure 3A "is rarely, if ever correct and would require highly persuasive evidentiary support." *Vitronics,* 90 F.3d at 1583; *see, e.g.,* '363 patent, fig. 3A. Contrary to the district court's conclusion, varied use of a disputed term in the written description attests to the breadth of a term rather than providing a limiting definition. *See, e.g., Ener-*

con GmbH v. Int'l Trade Comm'n, 151 F.3d 1376, 1385 (Fed.Cir.1998) (refusing to limit a term used "interchangeably" in the written description to only one of the uses of the term). That the term "protrusion" is used at various points in the written description to refer to "protrusions [that] may take any number of shapes" is simply not "a special and particular definition created by the patent applicant," *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1249 (Fed.Cir.1998), and is thus an insufficient reason to limit the scope of the claim. Furthermore, the parties point to nothing in the prosecution history compelling us to deviate from the ordinary meaning of "protrusion." Accordingly, we hold that the proper construction of "protrusion" is something that protrudes.

### c. "Mate"

 The claims of the '363 patent family require that the protrusion be "configured to *mate* with an inset of one or more adjacently positioned blocks." *See, e.g.*, '183 patent, col. 16, ll. 20–33 (emphasis added). The district court construed "mate" to require the following three limitations: "(1) a close confinement of the protrusion within the inset(s) of one or more blocks; (2) an ability to secure the blocks in place in a forwards and backwards direction; and (3) an interlocking of the protrusion with the insets." *Anchor*, 252 F.Supp.2d. at 844–45. Anchor does not dispute the district court's third limitation that "mate" is interchangeable with "interlock" in the patent specification. However, we hold that the first and second limitations of the district court's construction of "mate" are erroneous.

The ordinary meaning of "mate," as the district court found, is "to join or fit together." *Id.* at 845 (citing *Merriam–Web-*

*ster's New Collegiate Dictionary* 716). Contrary to the district court's narrow construction, the written description does not define "mate" as requiring "a close confinement of the protrusion within the inset(s) of one or more blocks." *Id.* at 844. In describing one preferred design, the written description only states that the area of the inset "should be"—not must be—"approximately the same area as, or only slightly larger than, protrusion 26 with which it will mate." '363 patent, col. 4, ll. 37–40. The written description makes quite clear that the open-ended examples of "mating" are merely illustrative; that is, they do not exhaustively delineate the scope of the term "mate" whose ordinary meaning is clear from the claims. *Id.* at col. 4, ll. 35–38 ("The area of the insets adjacent the block to surface 10 is *preferably* larger than the protrusion 26 by a factor of 5% *or more* and *preferably* about 1% to 2% *or more*." (emphases added)). Moreover, the general rule, of course, is that claims of a patent are not limited to the preferred embodiment, unless by their own language. *See, e.g., Va. Panel*, 133 F.3d at 866. That the term "mate" is used in a nonlimiting way in the written description with respect to preferred degrees of confinement is simply not "a special and particular definition created by the patent applicant," *Renishaw*, 158 F.3d at 1249, and is thus an insufficient reason to limit the scope of "mate" to require close confinement.

Furthermore, the prosecution history does not attribute a special meaning to the term "mate" as requiring an ability to secure the blocks in place in a forwards and backwards direction. *Anchor*, 252 F.Supp.2d at 844–46. During prosecution of the common parent application of the '363 patent family, the applicant distinguished features of its invention over prior

art by admitting that the insets "(1) extend into side surfaces of the blocks and (2) are for mating with a protrusion from a second, similarly configured block." The applicant also argued during prosecution that the prior art "references require some form of *additional* engagement structure (i.e., pins in Forsberg, and mortar in Italy 709,599) to secure each of the blocks in place" (emphasis in original). As these statements show, the patentee did not clearly and unmistakably relinquish any claim to a block in which the "mating" does not include the district court's functional limitation of restricting the movement of the block in a forwards and backwards direction. *Omega*, 334 F.3d at 1325–26 ("[F]or prosecution disclaimer to attach, our precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable."). Rather, the applicant's statements distinguish the prior art primarily in structural terms by emphasizing that the invention of the '363 patent family does not require an *additional* engagement structure such as pins or mortar to secure the blocks in place. We therefore do not consider the applicant's remarks to be a clear and unmistakable disavowal of claim scope as required to depart from the ordinary meaning of the term provided by the specification and therefore hold that the proper construction of "mate" is to join or fit together.

### 2. The "generally parallel" and "substantially horizontal" limitations in the '015 patent family

With respect to the '015 patent family, Anchor argues that the district court erred in its construction of the phrase "generally parallel" by effectively reading out the adverb "generally" and in its lack of construction of the term "substantially horizontal." Anchor also argues that the district court erred as a matter of law in concluding that prosecution history estoppel barred Anchor's claims of infringement of the '015 patent under the doctrine of equivalents.

Rockwood defends the district court's claim construction of "generally parallel" on the ground that the district court properly reasoned "that modifiers, no matter how strong, cannot alter the meaning of a claim term describing a mathematical concept so that the concept would be false if read to describe an accused device." *Anchor*, 252 F.Supp.2d at 852. Rockwood also argues that the district court did not err by declining to construe "substantially horizontal," because the district court already interpreted the term "substantially planar" and the interpretation of "horizontal" with respect to a surface presumes that the surface is planar.

#### a. "Generally Parallel"

■ Claims 38 and 50 of the '015 patent as well as claims 30 and 43 of the '713 patent require "a bottom face which is *generally parallel* to the top face." '015 patent, col. 18, ll. 22–23; *id.* at col. 16, ll. 42–43; '713 patent, col. 14, ll. 20–21; *id.* at col. 15, ll. 53–54 (emphasis added). Because "[parallelism] is a mathematical concept that is either true or false," *Anchor*, 252 F.Supp.2d at 853, the district court interpreted "generally parallel" to be limited to the ordinary meaning of "parallel." *Id.* at 852. This was error.

While the term "generally parallel," as the district court noted, is mathematically imprecise, we note that words of approximation, such as "generally" and "substantially," are descriptive terms "commonly used in patent claims 'to avoid a strict

numerical boundary to the specified parameter.'" *Ecolab, Inc. v. Envirochem, Inc.,* 264 F.3d 1358, 1367 (Fed.Cir.2001) (quoting *Pall Corp. v. Micron Separations, Inc.,* 66 F.3d 1211, 1217 (Fed.Cir.1995)); *see, e.g., Andrew Corp v. Gabriel Elecs. Inc.,* 847 F.2d 819, 821–22 (Fed.Cir.1988) (noting that terms such as "approach each other," "close to," "substantially equal," and "closely approximate" are ubiquitously used in patent claims and that such usages, when serving reasonably to describe the claimed subject matter to those of skill in the field of the invention and to distinguish the claimed subject matter from the prior art, have been accepted in patent examination and upheld by the courts). And, while ideally, all terms in a disputed claim would be definitively bounded and clear, such is rarely the case in the art of claim drafting. In this case, exact parallelism is sufficient, but not necessary, to meet the limitation of the claim term "generally parallel."

It is undisputed in this case that ordinarily, "parallel" means "everywhere equal distant." *Anchor,* 252 F.Supp.2d at 852 (citing *Merriam–Webster Collegiate Dictionary* 842 (10th ed.1998)). Additionally, the relevant definition of "generally" is "in disregard of specific instances and with regard to an overall picture; on the whole, as a rule." *Webster's Third New International Dictionary* 945. Because the claim language itself expressly ties the adverb "generally" to the adjective "parallel," the ordinary meaning of the phrase "generally parallel" envisions some amount of deviation from exactly parallel. It is the claim limitation, as a whole, that must be considered in claim construction. *Apex,* 325 F.3d at 1374.

The written description does not specify any special definition for the terms "gener-

ally," "parallel," or the phrase "generally parallel." *See, e.g.,* '015 patent, col. 5, ll. 5–6 ("The top surface 26 generally lies parallel to the bottom surface 28."); '713 patent, col. 5, ll. 10–11 (same). Moreover, nothing in the prosecution history of the '015 patent family clearly limits the scope of "generally parallel" such that the adverb "generally" does not broaden the meaning of parallel. Accordingly, we hold that the phrase "generally parallel" envisions some amount of deviation from exactly parallel.

### b. *"Substantially Horizontal"*

 Anchor also argues that, by not interpreting the only disputed term, "substantially horizontal," in claim 61 of the '713 patent, the district court erred as a matter of law. We agree. In order to review the court's finding of noninfringement, we must know what meaning and scope the district court gave to the asserted claims. *Graco Inc. v. Binks Mfg. Co.,* 60 F.3d 785, 791 (Fed.Cir.1995). From the district court's opinion, there is no basis for concluding that the district court performed either of the two steps required for a proper infringement analysis with respect to the "substantially horizontal" limitation before it granted partial summary judgment of noninfringement. As in *Graco,* a case on all fours with the situation here, "the entire omission of a claim interpretation analysis from the opinion, and the conclusory factual findings on infringement, each provide an independent basis for remand." *Id.* The district court therefore erred in two respects which preclude a proper grant of partial summary judgment of noninfringement.

### B. *Application of the Claims to the Accused Products*

#### 1. *Literal Infringement*

The district court concluded that there is no literal infringement of the '363 patent

family based on its construction of the claim terms. *Anchor,* 252 F.Supp.2d at 848. First, the district court determined that the Classic block does not "mate" as defined by the patents at issue because: (1) "[T]he extension does not mate with the sidewalls by any definition"; and (2) "The protrusion and sidewall of defendants' blocks do not cooperate to restrain the block's setback in both a forward and backward direction." *Id.* at 849 n. 12. The district court also determined that "the Classic block does not have a 'back surface' matching the construed definition," *id.* at 849, because "the Classic block has a partial back side portion with pointed side extensions that do not abut each other when placed adjacently in a course of blocks," *id* at 849 n. 13. Finally, the district court determined that "the Classic block lacks the characteristic of a 'protrusion' having a central narrow portion," *id.* at 849, because "[t]he 'protrusion' on the Classic block is ... a square extension extending from the bottom surface of the block." The district court also concluded that Cottage Stones II, III, and IV did not literally infringe the '015 patent family, because "[a] bottom face with a concave portion is not parallel to a top face that is perfectly planar." *Id.* at 852.

As discussed above, Part III.A, *supra,* the district court's findings with respect to no literal infringement of the '363 and '015 patent families are premised on erroneous or omitted constructions of the claim limitations "back surface," "protrusion," "mate," "generally parallel," and "substantially horizontal." We cannot determine with certainty, based on the factual record before us, whether there are any genuine issues of material fact regarding infringement by the accused products in light of our revised claim construction. Accordingly, we remand the portion of the district court's judgment· of noninfringement pertaining to the '363 and '015 patent families for further proceedings consistent with this opinion.

### 2. Infringement Under the Doctrine of Equivalents

Additionally, with respect to infringement of claims 38 and 50 of the '015 patent under the doctrine of equivalents, the district court held that this court's *en banc* holding in *Festo,* 234 F.3d 558, which was under consideration by the Supreme Court at the time the district court's decision was rendered, required an absolute bar to the application of the doctrine of equivalents in this case, because the applicant made a narrowing amendment to claims 38 and 50 of the '015 patent during prosecution. Because the Supreme Court rejected the absolute bar approach to prosecution history estoppel, *Festo,* 535 U.S. 722, 122 S.Ct. 1831, 152 L.Ed.2d 944, that analysis is now incorrect, and we vacate that portion of the district court's judgment. We agree with Anchor that the case should be remanded to the district court to determine, in the first instance, whether Anchor can rebut the *Festo* presumption. *See Schwing GmbH v. Putzmeister Aktiengesellschaft,* 305 F.3d 1318, 1329 (Fed.Cir.2002) (remanding rebuttal of presumptive bar to district court for determination in first instance). Accordingly, we vacate the portion of the district court's judgment of noninfringement of the asserted claims of the '015 patent under the doctrine of equivalents and remand for further proceedings consistent with this opinion.

Finally, with respect to claim 70 of the '713 patent, the parties dispute whether the district court properly granted partial summary judgment on the issue of noninfringement by equivalents. Anchor con-

tends that the district court only established that Cottage Stone III and IV do not literally infringe claim 70 of the '713 patent, but that genuine issues of material fact remain with respect to infringement of this claim by equivalents. Rockwood, in contrast, responds that Anchor failed to show a fact issue remains for infringement of claim 70 of the '713 patent under the doctrine of equivalents.

The district court concluded that the Cottage Stone III and IV do not *literally* infringe the limitation that the "second parts [of the sidewall surfaces] intersect[ ] the back surface at an angle of less than 90 degrees," because the Cottage Stone III and IV "lack a second part that joins a respective sidewall surface first part to the back of the surface.... Only the third parts intersect the back surface and they do not do so at an angle of less than 90 degrees." From this, it would appear that the district court granted partial summary judgment to Rockwood only with respect to literal infringement and did not address infringement of claim 70 of the '713 patent under the doctrine of equivalents.

■■■■■Infringement under the doctrine of equivalents frequently turns on questions of fact, such as whether the allegedly infringing device performs substantially the same function in substantially the same way to achieve substantially the same result as the claimed invention. *See Warner–Jenkinson Co. v. Hilton Davis Chem. Co.,* 520 U.S. 17, 40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). The district court did not provide findings with respect to whether any such triable issues of fact remain in this case. To the extent that the district court's judgment constituted a grant of partial summary judgment of non-infringement of claim 70 of the '713 patent under the doctrine of equivalents, we va-

cate that portion of the judgment and remand to the district court to articulate whether any triable issues of fact with respect to infringement of this claim by equivalents exists. If none exists or the issue was never briefed or argued to the district court, summary judgment in Rockwood's favor may be appropriate. Otherwise, trial on this issue, and resolution of any other relevant issues remaining in this case (e.g., validity) would be appropriate.

## C. *Motion to Strike*

■■■ Anchor argues that the district court abused its discretion by granting Rockwood's motion to strike the expert testimony of Peter Janopaul from the evidentiary record, on the grounds that the Janopaul declarations were (1) untimely and (2) contradict prior sworn testimony. We reject Anchor's argument.

■■■ A grant or denial of a motion to strike is not an issue unique to patent law, and we therefore apply the law of the regional circuit. *Bose,* 274 F.3d at 1360. The Eighth Circuit reviews the district court's imposition of discovery sanctions for an abuse of discretion, *Savola,* 644 F.2d at 745–47, and defines an abuse of discretion as "an erroneous view of the law or a clearly erroneous assessment of the evidence." *Trost v. Trek Bicycle Corp.,* 162 F.3d 1004, 1008 (8th Cir.1998). Given this standard of review, reference alone to the district court's response to Anchor's contentions is sufficient to decide the merits of this appeal. With respect to untimeliness, the district court noted:

In this litigation, the consolidated pretrial scheduling order of March 7, 2001, required that discovery under Fed. R.Civ.P. 26(a)(2)(A) and 26(a)(2)(3) close as of November 1, 2001. The Janopaul

declarations were served on the defendants after the close of discovery in this case. They therefore are untimely.

*Anchor,* 252 F.Supp.2d at 840. Moreover, with respect to the contradictory testimony, the district court concluded that an alternative ground for granting the motions to strike exists because a party may not submit affidavits purporting to create a genuine issue of fact if they simultaneously contradict prior sworn testimony by the affiant. *Id.* at 841 n. 2 (citing *Herring v. Can. Life Assurance Co.,* 207 F.3d 1026, 1030 (8th Cir.2000)). The district court determined that "the Janopaul declarations repeatedly contradicts [sic] Janopaul's previous sworn testimony." *Id.* In sum, we conclude that the district court did not abuse its discretion by granting Rockwood's motions to strike the Janopaul declarations from the evidence.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the district court is

*AFFIRMED–IN–PART, REVERSED– IN–PART, VACATED–IN–PART, AND REMANDED.*

## V. COSTS

Costs to plaintiff-appellant.